# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| THE CINCINNATI INSURANCE COMPANY, an Ohio corporation, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 04 C 4604 |
| BOLLER CONSTRUCTION, INC., an Illinois corporation; and KRZYSZTOF KULASIK, an individual, | ) ) ) ) | Judge Rebecca R. Pallmeyer |
| Defendants. | ) ) | |
| HARLEYSVILLE LAKE STATES INSURANCE COMPANY, a Michigan Corporation, | ) ) ) | |
| Intervening Plaintiff, | ) ) | |
| v. | ) ) | |
| CINCINNATI INSURANCE COMPANY, an Ohio Corporation, | ) ) ) | |
| Counter-Defendant. | ) ) | |

## MEMORANDUM OPINION AND ORDER

In this insurance coverage dispute, Plaintiff Cincinnati Insurance Co. seeks a declaration that it has no duty to defend or indemnify Defendant Boller Construction, Inc., the general contractor on a construction project in which the employee of one of Boller's subcontractors was injured. Intervening Plaintiff, Harleysville Lake Station Insurance Co., seeks equitable subrogation or contribution from Cincinnati, for amounts spent defending and indemnifying Boller in the underlying lawsuit.

## INTRODUCTION

On October 20, 1997, Krzysztof Kulasik was injured when he fell from scaffolding while working on a construction project in Mundelein, Illinois. At the time of the incident, Mr. Kulasik was employed by M. Burzynska Construction, Inc. ("MBC"), which was performing masonry work on the project as a subcontractor to Boller Construction, Inc. ("Boller"). Pursuant to its subcontractor agreement with Boller, MBC had agreed to name Boller as an additional insured on its own insurance policies. At that time, MBC maintained primary and umbrella insurance policies with Cincinnati Insurance Company ("Cincinnati"). Two years after he was injured, Mr. Kulasik sued Boller, alleging that it had negligently operated and supervised the job site where he was injured (the "Kulasik Suit"). Boller tendered its defense and indemnification to Cincinnati, claiming status as an additional insured under MBC's policies, but Cincinnati refused to extend coverage on the ground that Boller had been added to Cincinnati's primary policy with MBC one day *after* Mr. Kulasik's accident. And while Cincinnati conceded that Boller was covered under the umbrella policy between Cincinnati and MBC, Cincinnati claimed that that coverage was excess to Boller's own insurance. Harleysville Lake States Insurance Company ("Harleysville"), Boller's insurer, defended Boller and ultimately settled the case with Mr. Kulasik for $1.9 million.

In July 2004, Cincinnati brought this action seeking a declaratory judgment that it had no duty to defend or indemnify Boller in connection with the Kulasik Suit. In its answer, Boller alleged that it was insured under MBC's primary policy with Cincinnati on the date of Mr. Kulasik's accident, or, in the alternative, that if Boller was not covered, the policy should be reformed to name Boller as an additional insured as of February 1997. On October 20, 2004, Harleysville filed an intervening complaint seeking recovery against Cincinnati for the costs of defending and

2

indemnifying Boller. Cincinnati filed a three-count counterclaim against Harleysville on November 17, 2004, alleging that it had no duty to defend Boller, that its umbrella policy was excess to Boller's policies with Harleysville, and that, if its umbrella policy shared liability with Harleysville's, the two policies should share by relative policy limits.

Three motions for summary judgment are before the court.[1] Boller and Harleysville (collectively, "Defendants") have moved jointly for summary judgment on Cincinnati's complaint for declaratory judgment and on Harleysville's intervening complaint. Cincinnati has filed separate motions for summary judgment on its complaint for declaratory judgment and on Boller's and Harleysville's requests to reform Cincinnati's primary policy with MBC. Because the court concludes that Cincinnati owed no duty to defend Boller under Cincinnati's primary policy with MBC, Cincinnati's motion is granted, and Defendants' motion is denied, with respect to that policy. Furthermore, Cincinnati's motion is granted with respect to Defendants' claims for reformation of the primary policy because Defendants have not raised a genuine issue of material fact concerning the meeting-of-the-minds element of reformation. Cincinnati's motion is granted, and Defendants' motion is denied, with respect to Cincinnati's umbrella policy with MBC, as well, because the court

---

[1] There is complete diversity among the parties. Plaintiff Cincinnati is an Ohio corporation with its principal place of business in Ohio; Intervening Plaintiff Harleysville is a Michigan Corporation with its principal place of business in Traverse City, Michigan; and Defendant Boller is an Illinois corporation with its principal place of business in Waukegan, Illinois. Statement of Facts Submitted by Harleysville and Boller (hereinafter "Boller/Harleysville LR 56.1(a) Stmt."), ¶¶ 1–3. The amount in controversy exceeds $75,000, exclusive of interest and costs. Boller/Harleysville LR 56.1(a) Stmt., Ex. 2 at 99. Venue is proper under 28 U.S.C. 1391(a)(2) because a substantial part of the events giving rise to the claim occurred in this District. *Id.* Although the parties do not address choice of law, they evidently agree that Illinois substantive law governs as all three rely on Illinois authorities. Accordingly, this court may properly apply the law of the state in which it sits. *See Employers Ins. of Wausau v. Bodi-Wachs Aviation Ins. Agency, Inc.*, 39 F.3d 138, 142 n.2 (7th Cir. 1994).

concludes that Cincinnati did not breach its duty to defend Boller under that policy. The court concludes, however, that Harleysville is entitled under its equitable contribution theory to half of the $900,000 by which the Kulasik settlement exceeded Boller's primary policy with Harleysville.

## FACTUAL BACKGROUND

The relevant facts, based on the parties' Local Rule 56.1 statements and attachments, are as follows.

### A. The Cincinnati/MBC Insurance Policies

Boller, as general contractor, and MBC, as subcontractor, executed two contracts for work to be performed on separate construction projects in Illinois. Boller/Harleysville LR 56.1(a) Stmt. ¶ 61. Sometime in 1996—the record does not disclose a precise date—MBC began construction work on the first project at Oak Grove School in Green Oaks, Illinois (the "Oak Grove Project"). *Id.* at ¶ 62. The Oak Grove subcontractor agreement is not included in the record, but Robert Boller, Boller's president at the time that Boller and MBC executed the subcontractor agreement, testified that a standard provision of Boller's subcontractor contracts required its subcontractor to name Boller as an additional insured on the subcontractor's insurance polices. *Id.* at ¶ 142. Presumably the Oak Grove subcontractor agreement contained such an additional-insured requirement, as Boller was added as an additional insured, effective December 17, 1996, to MBC's general liability insurance policy with Cincinnati (the "Primary Policy"). *Id.* at ¶ 4. By its terms, the endorsement adding Boller to the policy made Boller an additional insured "RE: ADDITIONAL RENOVATION – PH. II CONSTRUCTION, PROJECT NO. 42727, OAK GROVE SCHOOL,

GREEN OAKS, IL." 1996 Boller Endorsement, Ex. 13 to Boller/Harleysville LR 56.1(a) Stmt., at 539.[2]

In addition to this Primary Policy, Cincinnati had also issued an umbrella insurance policy (the "Umbrella Policy") to MBC, effective December 9, 1996. Boller/Harleysville LR 56.1(a) Stmt. ¶ 138. Although there is no separate endorsement naming Boller as an insured under this policy, the "Who is an Insured" provision of the Umbrella Policy includes as an insured any organization for which MBC is obligated by written contract to provide insurance. *Id.* at ¶ 139. The Primary Policy expired on January 4, 1997. *Id.* at ¶ 4. The Umbrella Policy remained in effect at all times relevant to this lawsuit. Cincinnati Umbrella Policy, Ex. 1 to Boller/Harleysville LR 56.1(a) Stmt., at 71.

Cincinnati and MBC renewed the Primary Policy effective January 4, 1997 through January 4, 2000, *see* Primary Policy, Ex. 1 to Boller/Harleysville LR 56.1(a) Stmt., at 12, but they did not renew the endorsement adding Boller as an additional insured. Boller/Harleysville LR 56.1(a) Stmt. ¶¶ 19–20. Consequently, as of January 4, 1997, Boller was no longer an additional insured on the Primary Policy. *See* Kristoffersen Dep., Ex. 13 to Boller/Harleysville LR 56.1(a) Stmt., at 407–09. Then, on February 18, 1997, MBC asked Premier Risk Services, Inc. ("Premier"), for a certificate of insurance identifying Boller as an additional insured under the renewed policy. Premier "Deletion Report," Ex. 13 to Boller/Harleysville LR 56.1(a) Stmt., at 675;[3] *see also* Kristoffersen Dep. at 410.

---

[2] A brief note concerning record citations. The 17 Exhibits accompanying Defendants' LR 56.1 Statement are consecutively paginated, 1–2099. For example, 1996 Boller Endorsement is attached to Bonnie Kristoffersen's deposition (Exhibit 13), and appears at Bates page 539.

[3] The "Deletion Report" is an electronic record Premier maintains containing
(continued...)

Cincinnati asserts that Premier was acting as MBC's agent. *See* Cincinnati's Reply Brief in Support of its Motion for Summ. J. on Coverage (hereinafter "Coverage Reply"), at 8. Cincinnati and Premier were, however, parties to an "Agency Agreement," effective January 1, 1997, pursuant to which Premier was authorized to "accept and bind contracts of insurance . . . [on] [a]ll lines of insurance." Agency Agreement, Ex. 12 to Boller/Harleysville LR 56.1(a) Stmt., at 360. Moreover, Premier issued certificates of insurance and endorsements identifying additional insureds on Cincinnati policies. *See, e.g.*, Boller/Harleysville LR 56.1(a) Stmt. ¶¶ 45–46; *see also* Agency Agreement at 361 (Premier was responsible for sending Cincinnati "copies of all applications, insurance binders and *requests for policy changes* within three working days *after the effective date of coverage*.") (emphasis added).

On February 18, 1997, Bonnie Kristoffersen, Premier's customer service representative assigned to MBC's account, issued the certificate to MBC. Boller/Harleysville LR 56.1(a) Stmt. ¶ 24. The certificate identified Boller as an additional insured "with respects [sic] to general liability . . . re: addition and renovation - PH. II Construction, Project No. 42727, Oak Grove School, Green Oaks, IL." February 1997 Insurance Certificate, Ex. 13 to Boller/Harleysville LR 56.1(a) Stmt., at 549. The certificate itself did not, by its terms, "amend, extend or alter" the Primary Policy. *See Id.* ("THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW."). Ms. Kristoffersen testified that in the ordinary course of business she would have issued

---

[3](...continued)
documents related to particular client accounts. *See* Kristoffersen Dep. at 396–97.

6

an endorsement—which formally amends the policy to add an additional insured—at the same time she issued the certificate of insurance. Boller/Harleysville LR 56.1(a) Stmt. ¶ 26–28; Kristoffersen Dep. at 413. No endorsement bearing the date "February 18, 1997" appears in the Primary Policy, however. *See generally* Primary Policy at 12–70.

On May 23, 1997, Boller sent Premier a request for a revised certificate of insurance to reflect automobile coverage and to extend the cancellation-notice period from 10 to 30 days.[4] *Id.* at ¶¶ 39–40. Boller's request indicated that the revised certificate should be in a form similar to February 18, 1997 certificate, which Boller attached as "a sample copy of a certificate of insurance for this project." *See id.*; May 1997 Boller Memorandum, Ex.14 to Boller/Harleysville LR 56.1(a) Stmt., at 914. Ms. Kristoffersen issued a revised certificate on May 28, 1997 that reflected changes consistent with Boller's request. *See* May 1997 Revised Insurance Certificate, Ex.13 to Boller/Harleysville LR 56.1(a) Stmt., at 699. Like the prior certificate, this revised certificate identified Boller as an additional insured with respect to the Oak Grove Project, but mentioned no other projects. *Id.*

On September 4, 1997, MBC and Boller entered into a subcontractor agreement for a second construction project, this one for the construction of an elementary school for the Freemont School District in Mundelein, Illinois (hereinafter, the "Freemont Project."). Freemont Subcontractor Agreement, Ex. 15 to Boller/Harleysville LR 56.1(a) Stmt., at 1061. Consistent with Boller's past

---

[4]     The record does not disclose why Boller made this request to Premier directly, rather than through MBC. The court notes, however, that Boller later made premium payments directly to Premier on MBC's behalf—apparently out of concern that MBC might default. *See infra*, n.5.

practice, the Freemont subcontractor agreement required MBC to add Boller as an additional insured on MBC's insurance policies. *See id*. at 1062.[5]

## B. The Kulasik Suit and Boller's Attempts to Tender Defense and Indemnification to Cincinnati

On October 20, 1997, Mr. Kulasik fell from scaffolding while working on the Freemont Project; he later claimed that he injured his knee and fractured his ribs in the incident. *See* Boller/Harleysville LR 56.1(a) Stmt. ¶¶ 63, 87; "Updated Pretrial Report," Ex. 15 to Boller/Harleysville LR 56.1(a) Stmt., at 1066. The day after Mr. Kulasik was injured, a Boller employee faxed Ms. Kristoffersen a request for issuance of a certificate of insurance "ASAP," "per attached requirements." October 21, 1997 Fax, Ex.13 to Boller/Harleysville LR 56.1(a) Stmt., at 706. This fax attached a partially completed certificate of insurance identifying Boller; the Board of Education Freemont School District 79; and Legat Architects, as additional insureds "Re: Freemont K-3 Elementary School, Mundelein, IL 60060." *Id*. at 705. On October 21, 1997, Marlene Tovar, a Premier employee, prepared a certificate substantially in the form that the Boller employee had requested. October 21, 1997 Insurance Certificate, Ex.13 to Boller/Harleysville LR 56.1(a) Stmt., at 702–04. On October 22, 1997, an endorsement adding the same three parties was sent to MBC. Boller/Harleysville LR 56.1(a) Stmt. ¶ 46. The effective date of the endorsement is October 21,

---

[5]     Mr. Boller testified that around the time that Boller and MBC executed the Freemont Project agreement, Boller began paying MBC's insurance premiums to Premier. Boller Dep. at 817–820. In subsequent interrogatory answers, however, Boller identified only two such payments, both dated several months after Mr. Kulasik's injury. *See* Boller Construction Inc.'s Answers to Second Set of Interrogatories, Ex. 18 to Aff. of Dennis M. Dolan in Support of Cincinnati Ins. Co.'s Replies in Support of Cincinnati's Motions for Summary Judgment (hereinafter "Dolan Aff."), at 9.

1997—one day after Mr. Kulasik was injured. October 1997 Boller Endorsement, Ex. 1 to Boller/Harleysville LR 56.1(a) Stmt., at 70.

Mr. Kulasik filed a lawsuit against Boller on October 20, 1999, alleging that Boller's negligence was the proximate cause of his injuries. Kulasik Complaint, Ex. 14 to Boller/Harleysville LR 56.1(a) Stmt., at 876–77. Shortly after Boller was served with the complaint (the precise date is not clear from the record), Boller forwarded the suit papers to Harleysville. Boller/Harleysville LR 56.1(a) Stmt. ¶ 214. On February 2, 2000, John Prusik, the attorney retained by Harleysville to represent Boller, sent MBC a letter tendering Boller's defense and indemnification in the Kulasik Suit to MBC and Cincinnati. *See* Boller/Harleysville LR 56.1(a) Stmt. ¶¶ 95–96. In his letter, Mr. Prusik cited the provision of the Freemont Project subcontractor agreement requiring MBC to name Boller as an additional insured on its policies, and attached two insurance certificates identifying Boller as an additional insured on MBC's policies with Cincinnati. February 2000 Tender Letter, Ex. 14 to Boller/Harleysville LR 56.1(a) Stmt., at 895–97. Both certificates postdate Mr. Kulasik's accident. *Id.* at 896–97 (attaching certificates dated January 14, 1998, and October 22, 1997). On May 24, 2000, Boller filed a three-count, third-party complaint against MBC in the Kulasik Suit for contribution, indemnification and breach of contract. Boller/MBC Third-Party Complaint, Ex. 13 to Boller/Harleysville LR 56.1(a) Stmt., at 732. Boller's breach-of-contract count cited the February 2, 2000 letter, stated that Boller's tender had "not been accepted by any insurance company," and alleged that MBC had breached the Freemont Project subcontractor agreement by "not providing complete comprehensive general liability coverage." *Id.*

Mr. Prusik made a second attempt to tender Boller's defense to Cincinnati on November 14, 2000, this time in a letter addressed to Premier. November 2000 Tender Letter, Ex. 14 to

Boller/Harleysville LR 56.1(a) Stmt., at 898. Ms. Kristoffersen transmitted the complaint and the November 14 letter to Cincinnati on or about December 13, 2000. Boller/Harleysville LR 56.1(a) Stmt. ¶ 102. According to Cincinnati's "Liability Initiation Report," dated June 13, 2001, Cincinnati received these materials sometime in "late 2000." *Id.* at ¶ 111. In June 2001, Ronald Day, Cincinnati's regional claim superintendent, reviewed the Liability Initiation Report as well as Cincinnati's "home office" file for MBC.[6] Day Dep., Ex. 15 to Boller/Harleysville LR 56.1(a) Stmt., at 973, 1015. In his deposition, Mr. Day recalled that among those documents, he saw only one that identified Boller as an additional insured—the October 21, 1997 endorsement. Day Dep. at 982. By the time that Cincinnati formally responded to Boller's tender on July 3, 2001, however, Mr. Kulasik had voluntarily dismissed his lawsuit and Cincinnati concluded that there was, therefore, no need to determine Cincinnati's obligations, if any, to Boller. Boller/Harleysville LR 56.1(a) Stmt. ¶¶ 122–24. In his July 3, 2001 letter to Boller's counsel, Mr. Day, without expressing an opinion on the merits of Boller's tender, requested that Boller's counsel contact him directly should the Kulasik matter "resurface." July 2001 Day/Prusik Letter, Ex. 15 to Boller/Harleysville LR 56.1(a) Stmt., at 1070.

Mr. Kulasik did refile his lawsuit on April 11, 2002, and Boller's counsel renewed his tender to Cincinnati. *Id.* at ¶ 126. Mr. Day formally denied Boller's tender by letter dated May 21, 2002. *Id.* at ¶¶ 188–89. In his letter, Mr. Day cited the October 21, 1997 endorsement and noted that Boller was not added as an additional insured to the Primary Policy until after Mr. Kulasik's injury.

---

[6] The record does not disclose a precise reason for the almost six-month delay, but does include an email exchange between two Cincinnati employees which suggests that the file was misplaced in Cincinnati's "W.C." file for MBC. *See* June 19, 2001 Hargrave–Betz Email, Ex. 15 to Boller/Harleysville LR 56.1(a) Stmt., at 1079.

May 2002 Rejection Letter, Ex. 15 to Boller/Harleysville LR 56.1(a) Stmt., at 1077. This letter does not mention the Umbrella Policy, however. *Id.* Meanwhile, Harleysville resumed Boller's defense in the refiled action, which included refiling Boller's third-party complaint against MBC for contribution, indemnification and breach of contract. *See* Boller/Harleysville LR 56.1(a) Stmt. ¶¶ 224–26; Harleysville "Log Notes," Ex. 17 to Boller/Harleysville LR 56.1(a) Stmt., at 1699.

The record reflects no further dealings between these parties until June 30, 2003, when Cincinnati's reiterated its position that Boller was not added to the Primary Policy until after Mr. Kulasik's injury. June 2003 Nightingale–Prusik Letter, Ex. 14 to Boller/Harleysville LR 56.1(a) Stmt., at 940.[7] In counsel's June 30, 2003 letter, Cincinnati acknowledged, apparently for the first time, that Boller was an insured under the Umbrella Policy. *Id.* at 940–41. Cincinnati maintained that its duty to defend Boller under that policy was triggered only if Boller did not have other insurance applicable to the Kulasik Suit, or if such insurance were exhausted, and asserted that Boller had not established that these conditions were satisfied. *Id.* at 941.

A year later, on June 17, 2004, Mr. Prusik tendered the Kulasik Suit to Cincinnati one more time, Boller/Harleysville LR 56.1(a) Stmt. ¶ 193; Cincinnati's counsel rejected the claim by letter dated that same day. *Id.* at ¶¶ 195–96. This letter reiterates Cincinnati's position with respect to the October 21, 1997 endorsement, and claims with respect to the Umbrella Policy that it was excess to "all other collectible insurance, including Boller's own CGL [comprehensive general liability] policies." June 2004 Rejection Letter, Ex. 15 to Boller/Harleysville LR 56.1(a) Stmt., at 1087.

---

[7] This letter states that it is in response to Mr. Prusik's "renewed request" for defense. June 2003 Nightingale–Prusik Letter at 940. It is not clear from the record what "renewed request" this letter is referring to, however.

Cincinnati's counsel observed in her letter that it was Cincinnati's "understanding" that Boller's own comprehensive general liability carrier was providing coverage for the Kulasik Suit. *Id*.

## C.  Harleysville Defends and Indemnifies Boller in the Kulasik Suit

Boller was, in fact, insured by two policies issued by Harleysville.  Both policies, policy number LS-5S-2949825-7 (the "Harleysville Primary Policy") and policy number 2C 052930-7DB (the "Harleysville Umbrella Policy"), were in place on the day that Mr. Kulasik was injured. Boller/Harleysville LR 56.1(a) Stmt. ¶¶ 260, 262.  Harleysville paid for Boller's defense in the Kulasik Suit, which culminated in a $2,219,370 verdict for Mr. Kulasik on July 19, 2004.  *Id*. at ¶¶ 222, 229. Harleysville then negotiated a $1,900,000 settlement on September 27, 2004, paying $1,000,000 under the Harleysville Primary Policy—the limit of that policy—and the remaining $900,000 under the Harleysville Umbrella Policy.  *Id*. at ¶ 238.  Harleysville twice invited Cincinnati to participate in settlement negotiations, but Cincinnati refused on both occasions.  *Id*. at ¶¶ 228, 233.

On July 16, 2004, Cincinnati filed this declaratory judgment action.  *Id*. at ¶ 243.  Cincinnati attached a certified copy of the Primary Policy to its complaint.  Primary Policy at 12.  This copy of the policy contains two endorsements identifying Boller as an additional insured: (1) the October 21, 1997 endorsement described earlier; and (2) an undated endorsement.  *Id*. at 58, 70.[8]  Boller voluntarily dismissed Count III of its third-party complaint against MBC in state court on October

---

[8]      As previously discussed, Mr. Day could recall reviewing only one document identifying Boller as an additional insured when he reviewed MBC's file in 2001—the October 21, 1997 endorsement.  When shown the undated endorsement at his deposition, Mr. Day testified that he could not recall having seen that document.  Day Dep. at 982.

6, 2004. October 6, 2004 Order, Ex. 13 to Boller/Harleysville LR 56.1(a) Stmt., at 299.[9] In response

to an interrogatory regarding Boller's decision to dismiss its breach-of-contract claim against MBC,

Harleysville cited the undated endorsement, presumably as evidence that MBC had in fact added

Boller as an additional insured as required by the subcontractor agreement. *See* Harleysville's

Answers to Second Set of Interrogatories, Ex. 7 to Boller/Harleysville LR 56.1(a) Stmt., at 9.[10] Much

of the parties' dispute regarding the Primary Policy concerns the provenance and effect of this second

endorsement.

## DISCUSSION

Three motions for summary judgment are before this court. In one motion, Defendants

Boller and Harleysville seek summary judgment on Cincinnati's complaint for declaratory judgment

and on Harleysville's intervening complaint. Cincinnati has filed separate motions for summary

judgment on its complaint for declaratory judgment and on Defendants' request to reform the

Primary Policy. Summary judgment is appropriate when "the pleadings, depositions, answers to

---

[9] On October 2, 2003, the Illinois circuit court granted MBC's motion for summary judgment on Count II, which had sought indemnification pursuant to paragraph 4.8 of the Freemont Project subcontractor agreement. *See* Oct. 2003 Order, Ex. 8 to Boller/Harleysville LR 56.1(a) Stmt., at 300. The record does not disclose the basis for this ruling. On July 7, 2004, the circuit court approved MBC's and Boller's agreement to settle Count I, which had alleged that MBC's negligence caused Mr. Kulasik's injury and sought contribution under Illinois' Joint Tortfeasor's Contribution Act. *See* July 2004 Order, Ex. 8 to Boller/Harleysville LR 56.1(a) Stmt., at 301.

[10] Presumably this interrogatory was directed to Harleysville because Harleysville controlled Boller's defense in the Kulasik Suit, including Boller's third-party complaint against MBC. *See* Boller/Harleysville LR 56.1(a) Stmt. at ¶¶ 216, 225. The court also notes that Defendants may have had strategic reasons for dismissing the third-party complaint against MBC. MBC was evidently "out of business," *see* Liability Initiation Report, Ex. 15 to Boller/Harleysville LR 56.1(a) Stmt., at 1035, and Defendants' position in this case that Boller was an additional insured on MBC's policies with Cincinnati conflicts with its position in the Kulasik Suit that MBC failed to procure insurance as required by its subcontractor agreement with Boller.

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c).

Cincinnati contends that Boller was added to the Primary Policy one day after Mr. Kulasik was injured, and consequently Cincinnati had no duty to defend or indemnify Boller under that policy. Cincinnati concedes that Boller was an insured under the Umbrella Policy, but argues that its duty to defend under that policy was not triggered because Boller's policies with Harleysville provided complete defense and indemnification. Defendants insist that Boller was added to the Primary Policy on or about February 18, 1997—before Mr. Kulasik's accident. Alternatively, they seek to reform the Primary Policy to reflect coverage effective February 18, 1997 as they contend that this was the parties' true intent. Defendants further contend that Cincinnati breached its duty to defend under both the Primary Policy and the Umbrella Policy and is therefore estopped to deny coverage under those policies. To resolve these motions, the court must consider whether Boller is entitled to coverage under the Primary Policy as written; whether Cincinnati is estopped from denying coverage to Boller; if there is no coverage for Boller, whether Boller is entitled to reformation; and whether Cincinnati has any liability under the Umbrella Policy. The court addresses these issues in turn.

## A.    No Duty to Defend Under the Primary Policy

The legal principles that guide the court's analysis are well-recognized. The court interprets the terms of an unambiguous insurance contract as a matter of law, *Crum & Forster Managers Corp. v. Resolution Trust Corp.*, 156 Ill.2d 384, 391, 620 N.E.2d 1073, 1077 (1993), with the goal of

determining the contracting parties' intent. *Outboard Marine Corp. v. Liberty Mut. Ins. Co.*, 154 Ill.2d 90, 108, 607 N.E.2d 1204, 1212 (1992). To that end, the court must interpret the insurance contract as a whole—no one provision should be read in isolation. *Id.* Moreover, the court will construe unambiguous policy terms according to their "plain, ordinary, and popular meaning." *Id.* Policy terms are ambiguous if they are susceptible of more than one reasonable interpretation. *Id.* at 108–9, 607 N.E.2d at 1212–13. Ambiguities must be resolved in the insured's favor. *See id.* Whether the contract is ambiguous is a question of law for the court. *Cent. Ill. Pub. Serv. Co. v. Amer. Empire Surplus Lines Ins. Co.*, 267 Ill. App. 3d 1043, 1048, 642 N.E.2d 723, 726 (1st Dist. 1994). A policy term is not ambiguous simply because the parties disagree about its meaning. *Id.*

Emphasizing the October 21, 1997 endorsement, Cincinnati asserts that Boller was added to the Primary Policy one day *after* Mr. Kulasik's accident. Cincinnati's Opp'n to Defs.' Motion for Summ. J. on Coverage (hereinafter "Cincinnati's Opp'n"), at 4. Defendants concede that this endorsement did not require Cincinnati to defend or indemnify Boller in the Kulasik Suit. *See* Boller's and Harleysville's Memorandum of Law in Support of their Motion for Summ. J. (hereinafter "Defs.' Mem. of Law"), at 1. Instead, Defendants rely on the second, undated endorsement attached to the Primary Policy. *See* Primary Policy at 58. Relying on this second endorsement, Defendants argue that at the time of Mr. Kulasik's accident, Boller was an additional insured with respect to liability "arising out of" MBC's operations. Defs.'s Mem. of Law, at 5. The court agrees that this endorsement, which is not, by its terms, limited to any particular project, would obligate Cincinnati to defend Boller if it predated Mr. Kulasik's injury. *See, e.g., Cas. Ins. Co. v. Northbrook Prop. & Cas. Ins. Co.*, 150 Ill. App. 3d 472, 476, 501 N.E.2d 812, 815 (1st Dist. 1986) (construing similar language

15

to confer additional insured coverage for a general contractor without any showing that the subcontractor acted negligently with respect to the underlying plaintiff's injury).

Boller has the burden of establishing that it is covered under the Cincinnati policy. *See St. Michael's Orthodox Catholic Church v. Preferred Risk Mutual Ins. Co.*, 146 Ill. App. 3d 107, 109, 496 N.E.2d 1176, 1178 (1st Dist. 1986) ("[T]he existence of coverage is an essential element of the insured's case, and the insured has the burden of proving that his loss falls within the terms of his policy."). Boller here merely speculates that the undated endorsement was added to the policy on or about February 18, 1997. *Id.* at 1–4. To support this claim, Boller relies on the February 18, 1997 insurance certificate and Ms. Kristoffersen's testimony that an endorsement adding Boller to the Primary Policy should have been issued at that same time. *Id.* at 3. Because Ms. Kristoffersen intended to issue an additional insured endorsement, and an undated endorsement is attached to the Primary Policy, Boller infers that this endorsement is the "missing" February 1997 endorsement. *Id.* at 4. Ms. Kristoffersen testified only that she "can't tell" whether the undated endorsement was added in February 1997 or at some other time. Kristoffersen Dep. at 419. Indeed, Defendants do not cite any evidence or case law that takes their theory about the origins of the undated endorsement out of the realm of speculation and inference.

Boller's reliance on *Zannini v. Reliance Ins. Co.* for this purpose is unavailing. 147 Ill.2d 437, 590 N.E.2d 457 (1992). In that case, plaintiff entered into an oral agreement with an insurance agent for defendant insurer to provide approximately $25,000 of insurance coverage for jewelry loss. *Id.* at 443–44, 590 N.E.2d at 459. The written insurance contract that defendant issued provided only $500 of coverage, however. *Id.* at 440, 590 N.E.2d at 458. When plaintiff suffered a loss in the amount of $13,550, he argued that the written contract should be reformed to reflect coverage

16

consistent with his oral agreement with the agent. *Id.* at 441, 590 N.E.2d at 458. The court agreed with plaintiff that the parties had entered into a valid preliminary contract or "insurance binder," and that, to the extent the written insurance contract did not conform with the terms of the binder, it could be reformed. *Id.* at 455–57, 590 N.E.2d at 464–65. At best, *Zannini* might support Boller's claim for reformation of the Primary Policy along the lines of the alleged agreement between Ms. Kristoffersen and MBC to add Boller to that policy on February 18, 1997 (an argument discussed below). It does not, contrary to Defendants' assertions, support any particular interpretation of the Primary Policy or the undated endorsement, as written.

*West American Ins. Co. v. J.R. Construction Co.* is also distinguishable. 334 Ill. App. 3d 75, 777 N.E.2d 610 (1st Dist. 2005). In that case, Altra Steel ("Altra"), a subcontractor, orally agreed to add J.R. Construction ("J.R."), a general contractor, as an additional insured on Altra's policy with West American. *Id.* at 77, 777 N.E.2d at 612–13. When an injured employee of one of J.R.'s sub-subcontractors sued J.R., J.R. tendered its defense to West American. *Id.* at 77, 777 N.E.2d at 612. West American refused to defend J.R. on the ground that the insurance commitment was not in writing, but the court rejected that defense, concluding that J.R. was entitled to coverage because, among other things, West American had admitted in a letter to J.R. that it was an additional insured under the Altra policy and had issued a certificate of insurance to the same effect. *Id.* at 80–81, 777 N.E.2d at 615. Although, contrary to Cincinnati's assertions, the *West American* court did not rely on the automatic additional insured provision in Altra's policy, *see id.* at 80, 777 N.E.2d at 615, the case is nevertheless distinguishable. Cincinnati has never conceded Boller's status as an additional insured under the Primary Policy effective the date of Mr. Kulasik's accident. Moreover, Boller concedes that the certificate of insurance issued on February 18, 1997 did not confer additional

insured status. *See* Boller and Harleysville's Reply Brief in Support of their Motion for Summ. J. (hereinafter "Defs.'s Reply") at 7. To the contrary, the certificate of insurance expressly disclaims any impact on coverage. *See* Boller/Harleysville LR 56.1(a) Stmt., Ex. 13 at 549. Instead, Boller contends that this certificate is the "starting point" from which it draws inferences concerning the origins of the undated endorsement. Defs.'s Reply at 7. But *West American*, like *Zannini*, does not advance Defendants' argument that the undated endorsement was issued before October 20, 1997.

Cincinnati contends that this endorsement was actually issued in February 1999—more than a year after Mr. Kulasik's injury. Cincinnati's Opp'n, at 3. The Cincinnati executive who supervised the preparation of the Primary Policy from Cincinnati's underwriting file, Frederick Ferris, explained in his affidavit that the Primary Policy includes "all policy forms, changes and corrections . . . that became effective at any time during the period that the Policy was in effect." *See* Ferris Aff. ¶ 3, Ex. 17 to Dolan Aff. The undated "Additional Insured" endorsement is printed on Cincinnati's form "CG2026" and is physically located in the Primary Policy after a February 19, 1999 "Commercial General Liability Coverage Part Endorsement." *See* Primary Policy, at 54, 58; *see also* Schweinfest Aff. ¶ 12, Ex. B. to Aff. of Dennis M. Dolan in support of Cincinnati Ins. Co.'s Opp'n to Boller Const. Co.'s and Harleysville Ins. Co.'s Motion for Summ. J. (characterizing the Commercial General Liability Coverage Part Endorsement as a "change endorsement."). The February 19, 1999 change endorsement adds forms "CG2026" and "CG2010" by reference. *See id.* at 54. According to Mr. Ferris, the single reference to "CG2026" in the endorsement does not indicate that the endorsement adds only one form CG2026. *See* Ferris Aff. ¶ 9. In fact, with respect to this particular change endorsement, "CG2026" refers to four CG2026 forms: one for Boller, another for Board of Education–Freemont School District 79, a third for International Contractors, Inc. and a fourth for

R.I. Johnson & Assoc., each identified as an insured on a separate CG2026 form. Primary Policy at 57, 59–60. The next item in the underwriting file is a second "Commercial General Liability Coverage Part Endorsement," also dated February 19, 1999. *See* Boller/Harleysville LR 56.1(a) Stmt., Ex. 1 at 49. This change endorsement is stamped "corrected" and precedes three CG2026 forms identifying Board of Education–Freemont School District 79, International Contractors, Inc. and R.I. Johnson & Assoc. as insureds—Boller is not included. *See id*. at 49–53. Barry Schweinfest, Cincinnati's underwriting manager, believes that the undated endorsement was erroneously added in February 1999 and then was superseded by the "corrected" change endorsement excluding Boller. *See* Schweinfest Dep., Ex. 16 to Boller/Harleysville LR 56.1(a) Stmt., at 1208–09, 1227–32.[11]

Defendants do not directly rebut this evidence that the undated endorsement was likely issued in February 1999. Instead, they suggest that Cincinnati's explanation is inconsistent with the premium charges listed on the face of the change endorsements. *See* Boller and Harleysville's Mem. of Law in Opp'n to Cincinnati's Motion for Summ. J. on Coverage (hereinafter "Coverage Opp'n") at 4. As reflected in the change endorsement, Cincinnati charged MBC a $75 "Additional Premium" for these endorsements. Primary Policy at 54. Defendants cite Cincinnati's "General Liability Manual," which indicates that it charges a "flat premium" of $25 for each 2010 and 2026 endorsement. General Liability Manual, Ex. 13 to Boller/Harleysville LR 56.1(a) Stmt., at 615. Although this particular document was produced from Cincinnati's files, Ms. Kristoffersen testified

---

[11]     Defendants contend that, by certifying the Primary Policy, Cincinnati has admitted that the undated endorsement was effective and, therefore, it cannot now be "nullified." *See* Defs.' Reply, at 2–3. Whether Mr. Schweinfest was correct that the undated endorsement was added in error makes no difference here, however. Even if the undated endorsement is enforceable, it was not in existence prior to Mr. Kulasik's injury.

that it was she who prepared premium invoices when issuing additional insured endorsements. Kristoffersen Dep. at 382–85. Relying on Ms. Kristoffersen's testimony, Defendants contend that the $75 fee indicates that only three forms should be attached to the change endorsement, not the five that appear in the file (four CG2026 forms and one CG2010 form). Coverage Opp'n at 4.

Defendants' point is elusive; if the court were to conclude that the CG2026 naming Boller as additional insured was one of these three forms, that would only support a conclusion that Boller was entitled to coverage from February 1999 forward. Defendants perhaps believe that calling Cincinnati's assertions concerning the February 1999 change endorsement into doubt will also raise doubts about the provenance of the undated endorsement. But Defendants' argument that the undated endorsement was added in February 1997 is no less speculative if the court accepts Defendants' further speculation that it was not attached to the February 1999 change endorsement. The record does not contain a February *1997* change endorsement to which the undated endorsement might belong, nor is there any indication that such a document exists.

Nor is Ms. Kristoffersen's testimony helpful here. It was not Premier (Ms. Kristoffersen's employer) that issued CG2026 forms or Commercial General Liability Coverage Part Endorsements. Kristoffersen Dep. at 406, 416. These documents were created by Cincinnati. *Id*. Moreover, Mr. Schweinfest testified that Cincinnati's underwriters have discretion to vary premium charges. Schweinfest Dep. at 1212. Construing the Primary Policy as a whole, the court concludes that Cincinnati's assertion that the "undated" endorsement was added in February 1999 is consistent with the plain language of the contract and the surrounding circumstances.

Defendants move on to argue that even if the plain language of the Primary Policy does not support their interpretation, it is "[a]t a minimum," ambiguous. *See* Defs.' Reply, at 5. The court

20

disagrees. Defendants rely on Ms. Kristoffersen's testimony that an endorsement *should* have been issued on or about February 18, 1997, and infer that the undated endorsement *could* be that endorsement. But there is no evidence that any endorsement *was* issued on or about February 18, 1997. Nor are Defendants' speculations sufficient, as a matter of law, to create a dispute of fact concerning the date of issuance of an endorsement covering Boller. Boller was added to the renewed Primary Policy effective October 21, 1997—one day after Mr. Kulasik's accident. The court concludes that no written agreement imposed a duty on Cincinnati to defend Boller in the Kulasik Suit under the Primary Policy.

**B.     Cincinnati is Not Estopped to Deny Coverage Under the Primary Policy**

Defendants argue in the alternative that Cincinnati is estopped from denying Boller's status as an additional insured on the Primary Policy on the date of Mr. Kulasik's accident. Defs.' Mem. of Law, at 6. An insurer's duty to defend its insured is "much broader" than its duty to indemnify. *Crum*, 156 Ill.2d at 393–94, 620 N.E.2d at 1079. Accordingly, an insurer faced with a complaint alleging liability that is "potentially" covered by a policy that includes a duty to defend "may not simply refuse to defend the insured." *Employers Ins. of Wausau v. Ehlco Liquidating Trust*, 186 Ill.2d 127, 150, 708 N.E.2d 1122, 1134 (1999). Instead, the insurer must either: (1) defend the lawsuit under a reservation of rights; or (2) promptly seek a declaratory judgment that there is no coverage. *Id.* at 150–51, 708 N.E.2d at 1135. An insurer is justified in refusing to pursue either option only if it is clear on the face of the complaint, broadly construed, that the allegations are outside the scope of the policy's coverage. *Id.* at 153, 708 N.E.2d at 1136. Thus, an insurer that refuses to defend its insured or seek a declaratory judgment "will be estopped from raising any policy defenses to coverage," unless the insurer did not have the opportunity to defend; no policy existed; or "when

21

the policy and complaint are compared, there clearly was no coverage or potential for coverage." *Id.* at 150–51, 708 N.E.2d at 1135.

In this case, Cincinnati did not defend Boller under a reservation of rights. Nor did Cincinnati promptly seek a declaratory judgment on this issue; it did not file this suit until 25 months after Boller tendered the refiled lawsuit. *See* Boller/Harleysville LR 56.1(a) Stmt. ¶¶ 188–89, 243. *Cf.*, *West American*, 334 Ill. App. 3d at 86, 777 N.E.2d at 620 ("[T]he duty to defend was breached because West American waited 21.5 months from the time the defense was tendered until the time it filed its declaratory judgment action."). This delay was unjustified and, indeed, Cincinnati does not contend that by filing the present action it fulfilled its duty under the estoppel test outlined in *Ehlco*. Defendants argue that this delay alone is sufficient to estop Cincinnati from denying Boller's status as an insured under the Primary Policy with respect to the Kulasik Suit. *See* Defs.' Mem. of Law, at 7.

Defendants rely primarily on *American Standard Ins. Co. v. Gnojewski*, 319 Ill. App. 3d 970, 747 N.E.2d 367 (5th Dist. 2001). The insurer in *American Standard*, Gallant Insurance Company, insured three automobiles owned by Pamela Gnojewski. *Id.* at 971, 747 N.E.2d at 369. When Gnojewski defaulted on her premium payments, Gallant notified her that the policy would be cancelled effective June 10, 1995. *Id.* at 972, 747 N.E.2d at 369. On August 1, 1995, Gnojewski was involved in an accident in which she and another motorist were killed, and the other motorist's estate sued for negligence. *Id.* at 972, 747 N.E.2d at 369–70. Gnojewski's estate argued that Gallant was estopped to deny coverage because Gallant failed to send its cancellation notice to a lender who had a perfected security interest in the automobile, as required by Illinois law. *Id.* at 974–75, 747 N.E.2d at 371–72. Gallant was not aware of the lender's lien, but it was unclear whether the Illinois

Insurance Code provision requiring the insurer to send a cancellation notice to any affected lienholders, "if known," would include a lienholder of which Gallant had constructive notice. *Id.* at 974–75, 747 N.E.2d at 371–72. The court concluded that because the cancellation notice may not have been effective, there was at least the potential for coverage under the policy. *Id.* at 977, 747 N.E.2d at 374 ("The key to this case is that [the interpretation of "if known"] is a disputed question."). This potential for coverage, however minimal, triggered Gallant's obligation to defend Gnojewski under a reservation of rights or file a declaratory judgment action. *Id.* Gallant's failure to pursue either option was a violation of its duty to defend and therefore estopped Gallant from raising policy defenses to coverage. *Id.* at 978, 747 N.E.2d at 374–75.

In this court's view, *American Standard* is distinguishable. That case involved the cancellation of a policy that on its face provided coverage to the insured. Here, a straightforward comparison of Mr. Kulasik's complaint with the Primary Policy reveals that Boller was not covered under that policy on October 20, 1997, the date of Mr. Kulasik's injuries. Boller/Harleysville LR 56.1(a) Stmt. ¶ 87. Boller was added to the Primary Policy effective October 21, 1997. Cincinnati LR 56.1(b) Stmt. ¶ 2. Boller points out that Ronald Day, the claim manager who reviewed Boller's tender, did not review the undated endorsement when he determined that Boller was not covered. *See* Defs.' Mem. of Law at 8. If he had, Boller argues, the undated endorsement would have raised doubt about Boller's status under the policy, doubt which—under Boller's reading of *American Standard*—was sufficient to bring the Kulasik Suit at least potentially within the scope of the Primary Policy. *See* Defs.' Mem. of Law at 8. This argument appears to rest on an overstatement of the significance of the undated endorsement. *American Standard* involved a *bona fide* dispute about whether the cancellation notice was effective under Illinois law. By contrast, Defendants here have

done no more than attempt to capitalize on doubt created by their own unsupported speculations about the origins of the undated endorsement. In this case, there was no doubt that the Kulasik Suit did not trigger a duty to defend under the Primary Policy, and estoppel does not apply.

Accordingly, the court awards summary judgment in Cincinnati's favor and against Defendants on Count I of Harleysville's Intervening Complaint and on Boller's Second and Third Affirmative Defenses. Counts I and II of Harleysville's Intervening Complaint, asserting rights of equitable subrogation and equitable contribution, respectively, are denied to the extent that they are premised on Cincinnati's duty to defend Boller under the Primary Policy.

## C. Defendants Are Not Entitled to Reformation

In the alternative, in opposition to Cincinnati's motions, Defendants ask this court to reform the Primary Policy to include Boller as an additional insured effective the date of Mr. Kulasik's injury. *See* Boller/Harleysville LR 56.1(a) Stmt. ¶¶ 254, 275–76. Under Illinois law, reformation is appropriate only if "there has been a meeting of the minds which resulted in an actual agreement between the parties, and . . . when the agreement was reduced to writing and executed, an agreed-upon provision was omitted or one not agreed upon was inserted as a result of the mutual mistake of the parties." *See LaSalle Nat'l Bank v. 850 De Witt Place Condo. Assoc.*, 257 Ill. App. 3d 540, 543, 629 N.E.2d 704, 706 (1st Dist. 1994) (quoting *LaSalle Nat'l Bank v. 850 De Witt Condo. Assoc.*, 211 Ill. App. 3d 712, 715, 570 N.E.2d 606, 609 (1st Dist. 1991)) (internal quotations omitted). The party seeking reformation must prove each element by clear and convincing evidence. *See Magnus v. Barrett*, 197 Ill. App. 3d 931, 935, 557 N.E.2d 252, 255 (1st Dist. 1990).

Defendants have not raised a genuine issue of fact on the first element of reformation: a meeting of the minds between MBC and Cincinnati.[12] The record discloses only that MBC asked for and received a "renewal" insurance certificate identifying Boller as an additional insured "with respects [sic] to general liability . . . re: addition & renovation - PH. II Construction, Project No. 42727, Oak Grove School, Green Oaks, IL." *See* Premier "Deletion" Report at 675; February 1997 Insurance Certificate at 549. There is no evidence that MBC requested an endorsement at this time, nor any mention of the Freemont Project. Defendants infer that MBC did make such a request from Ms. Kristoffersen's testimony that she intended to issue an endorsement. *See* Boller and Harleysville's Mem. of Law in Opposition to Cincinnati's Motion for Summ. J. on Reformation (hereinafter "Defs.'s Reformation Opp'n") at 5. The inference is not unreasonable, but Ms. Kristoffersen never testified that she intended to issue an endorsement for the Freemont Project. She explained that Premier's general practice was to add general contractors like Boller "on a project by project basis." Kristoffersen Dep. at 459–60. Consistent with that practice, the February 18, 1997 certificate identifies Boller as an additional insured with respect to the Oak Grove Project only. February 1997 Insurance Certificate at 549. It was revised several months later, but remained limited to the Oak Grove Project. May 1997 Revised Insurance Certificate, at 699.

The only evidence Defendants cite for the proposition that the missing endorsement would have been broader than the certificate is Mr. Boller's "belief" that the certificate conferred coverage for all Boller/MBC projects during the renewed policy period. *See* Defs.'s Reformation Opp'n, at 5–6. Mr. Boller's personal beliefs, however, are not evidence that MBC and Cincinnati—through its

---

[12]      In light of this conclusion, the court does not reach Cincinnati's standing and waiver arguments.

agent, Premier—agreed to add Boller as an additional insured for all projects during the policy period. Notably, Boller and MBC did not execute the subcontractor agreement for the Freemont Project until September 4, 1997. Freemont Subcontractor Agreement at 1061. Whatever Boller's or MBC's intentions may have been, there is no evidence that Cincinnati (or Premier) agreed to add Boller to the Primary Policy with respect to the Freemont Project until October 21, 1997.

Accordingly, the court awards summary judgment in Cincinnati's favor and against Defendants on Count IV of Harleysville's Intervening Complaint and on Boller's First Affirmative Defense.

## D. Cincinnati Did Not Breach its Duty to Defend Under the Umbrella Policy

Cincinnati concedes that, by operation of the Umbrella Policy's blanket additional-insured provision, Boller was an "insured" under that policy on the date of Mr. Kulasik's accident. *See* Cincinnati Ins. Co.'s Mem. in Support of its Motion for Summ. J. on Coverage (hereinafter "Plaintiff's Coverage Motion"), at 10. The Umbrella Policy contains separate indemnification and defense provisions. *See* Umbrella Policy at 73, 76–77. With respect to defense, the Umbrella Policy provides as follows:

> We have the right and duty to defend any claim or "suit" against the insured for damages covered by this policy, even if the allegations are groundless, false, or fraudulent, when:
>
> > a. The applicable limits of the "underlying insurance" and any other insurance have been *exhausted by payment of claims*; or
> >
> > b. Damages are sought for "bodily injury", "property damage", "personal injury" or "advertising injury" which are not covered by underlying insurance or other insurance.

*See* Umbrella Policy at 76–77 (emphasis added).[13]

Cincinnati argues that because the Harleysville policies constitute "underlying" and "other" insurance, its duty to defend Boller was never triggered. Plaintiff's Coverage Motion at 11. Defendants, for their part, do not directly address whether the contractual preconditions to Cincinnati's duty to defend were met. Instead, they contend that Cincinnati's duty to defend under the Umbrella Policy was triggered when Boller tendered the Kulasik Suit to Cincinnati. Coverage Opp'n at 10. Comparing the underlying complaint with the Umbrella Policy, they argue that Mr. Kulasik's claims were at least potentially within the coverage afforded by that policy for "bodily injury," *see* Umbrella Policy at 73, and because Cincinnati did not defend Boller under a reservation of rights or timely file a declaratory judgment action, Cincinnati may not rely on the "excess" provisions of the Umbrella Policy to deny liability for the Kulasik settlement.

Defendants rely principally on *Korte Const. Co. v. Amer. States Ins.*, 322 Ill. App. 3d 451, 750 N.E.2d 764 (5th Dist. 2001). In that case, Korte Construction Company, serving as manager on a construction project undertaken by Miller & Maack General Contractors, Inc, was named as an additional insured on Miller & Maack's insurance policy with American States. *Id.* at 453, 750 N.E.2d at 766. A Miller & Maack employee was killed while working on the project, and Korte tendered defense of a wrongful death action against it to American States. *Id.* American States denied coverage without seeking a declaratory judgment or defending under a reservation of rights.

---

[13]      The policy defines "underlying insurance" as follows: "'Underlying insurance' means the policies of insurance listed on the Schedule of Underlying Policies and the insurance available to the insured under all other policies to the 'occurrence.' 'Underlying insurance' also includes any type of self-insurance or alternative method by which the insured arranges for funding of legal liabilities that affords coverage that this policy covers." Umbrella Policy at 84.

*Id.* at 456, 750 N.E.2d at 768. When Korte subsequently filed its own declaratory judgment action, American States answered by claiming that it had no duty to defend Korte because its coverage was excess to coverage provided by a second insurer. *Id.* at 454, 750 N.E.2d at 766–67. The trial court rejected that argument, concluding that American States was estopped from raising its "other insurance" clause as a policy defense, and the Illinois Appellate Court affirmed. *Id.* at 459, 750 N.E.2d at 770. The underlying wrongful death action was potentially within the scope of the American States policy, the court held, so American States was obligated to defend under a reservation of rights or seek a declaratory judgment. *Id.* at 458, 750 N.E.2d at 770. *See also West American*, 334 Ill. App. 3d at 86–87, 777 N.E.2d at 620 (insurer claiming that its policy was "excess" was required to defend under a reservation of rights or promptly file a declaratory judgment action). Instead, it did nothing, and was therefore "estopped from raising noncoverage as a defense to Korte's action for declaratory judgment and indemnification." *Id.*

Cincinnati points out that the insurance policy in *Korte* was not a true excess policy. *See* Coverage Reply at 11.[14] Rather, the American States policy in that case was a primary policy that contained an "other insurance" clause. *Korte*, 322 Ill. App. 3d at 454, 750 N.E.2d at 766. Illinois courts have recognized that umbrella policies provide a "unique and special coverage" distinct from the coverage provided by primary policies with "other insurance" provisions. *Illinois Emcasco Ins. Co. v. Continental Casualty Co.*, 139 Ill. App. 3d 130, 133, 487 N.E.2d 110, 112 (1st Dist. 1985). An umbrella or "catastrophe" policy "always remains excess over and above all other applicable forms

---

[14]     Although Cincinnati does not address *West American*, the policy in that case appears to have been a primary policy with an "other insurance" clause, as well. *See West American*, 334 Ill. App. 3d at 78, 777 N.E.2d at 613.

of contract." *Id.* at 134, 487 N.E.2d at 112 (quoting 8A Appleman, *Insurance Law and Practice* § 4906 (1981)) (internal quotations omitted). Under a true excess policy, coverage "is triggered [only] after the limits of the primary policy have been exhausted." *Travelers Indem. Co. v. Amer. Cas. of Reading*, 337 Ill. App. 3d 435, 439, 786 N.E.2d 582, 586 (1st Dist. 2003). Based on these authorities, Cincinnati argues that its duty to defend was never triggered because the Harleysville policies were not exhausted. *See* Cincinnati Opp'n, at 14.

The case law Cincinnati cites explains and illustrates the special status of true excess coverage. These cases do not specifically address estoppel,[15] and the Illinois Supreme Court has not addressed whether a "true excess" or "umbrella" insurer may be estopped from asserting its excess status. Illinois courts have recognized, however, that an insurer's duty to defend "arises from, and is limited by, the expressed undertaking to defend stated in the contract of insurance." *Village of Lombard v. Intergovernmental Risk Mgmt. Agency*, 288 Ill. App. 3d 1003, 1009, 681 N.E.2d 88, 92 (2nd Dist. 1997). In *Korte*, a primary insurer denied that it had a duty to defend based on a provision of its policy limiting its obligation to indemnify its insured. *See Korte*, 322 Ill. App. 3d at 459, 750 N.E.2d at 770; *see also Platinum Tech. v. Fed. Ins. Co.*, No.99 C 7378, 2000 WL 875881, *6 (N.D. Ill. 2000) ("'Other' insurance clauses have been recognized as not applying to the duty to defend because 'unless stated otherwise, that obligation is independent of *liability* and any limitations thereon.'") (quoting *Covington Twp. v. Pacific Emp. Ins. Co.*, 639 F. Supp. 793, 801 (M.D. Pa. 1986) (emphasis added). The insurer in *Korte* ran afoul of the principle that the duty to defend is broader than the duty to indemnify. *See Crum*, 156 Ill.2d at 393–94, 620 N.E.2d at 1079. But this maxim

---

[15]     *See, e.g., Fed. Ins. Co. v. St. Paul Fire and Marine Ins. Co.*, 271 Ill. App.3d 1117, 649 N.E.2d 460 (1st Dist. 1995) (apportioning settlement liability without discussing duty to defend).

does not operate independent of the "expressed undertaking to defend stated in the contract of insurance." *Village of Lombard*, 288 Ill. App. 3d at 1008–09, 681 N.E.2d at 92.

In this case, the parties specifically contracted to confine the duty to defend to those situations where the "applicable limits of the 'underlying insurance' *or any other insurance* have been exhausted by payment of claims." *See* Umbrella Policy at 76–77 (emphasis added). The combined limits of the Harleysville policies were not exhausted by payment of the Kulasik settlement. *See* Boller/Harleysville LR 56.1(a) Stmt. at ¶ 238. Accordingly, the court concludes that Cincinnati's duty to defend under the Umbrella Policy was not triggered, and therefore Cincinnati is not liable for any portion of defense payments made by Harleysville in the Kulasik Suit. *See* Umbrella Policy at 77 (imposing obligation to pay defense expenses only if Cincinnati has the duty to defend). Moreover, Cincinnati is not estopped from asserting its Umbrella Policy's excess insurance provisions to contest liability for "damages" in the Kulasik Suit and, therefore, grants summary judgment in Cincinnati's favor and against Defendants on Boller's Fourth Affirmative Defense.

## E.     Cincinnati's Liability for the Kulasik Settlement

The remaining question is whether those provisions excuse Cincinnati from any coverage obligation. The "Insuring Agreement" of the Umbrella Policy requires Cincinnati to pay the "ultimate net loss which the insured is legally obligated to pay as damages *in excess of* the underlying insurance . . . ." *See* Umbrella Policy at 73 (emphasis added) (internal quotation marks omitted).[16] The Umbrella Policy also contains an "Other Insurance" provision, which provides that "[t]he

---

[16]     "Ultimate net loss" is defined as the "sum actually paid or payable in the settlement or satisfaction of the insured's legal obligation for damages covered by this insurance either by adjudication *or compromise*." Umbrella Policy at 84 (emphasis added).

insurance provided by this policy is excess over any other valid and collectible insurance, other than insurance written specifically to be excess over this insurance, and shall not be contributory." *Id.* at 81. Relying on these provisions, Cincinnati contends that its Umbrella Policy is "excess" to both Harleysville policies and is therefore not liable for the Kulasik settlement. *See* Plaintiff's Coverage Motion at 12. Harleysville argues that Cincinnati is primarily liable for the Kulasik settlement because Boller "selectively tendered" the Kulasik Suit to Cincinnati, *see* Coverage Opp'n at 14,[17] and, therefore, under the theory of equitable subrogation, Harleysville is entitled to recover from Cincinnati the entire $900,000 by which the Kulasik settlement exceeded Harleysville's Primary Policy. *See* Def.'s Mem. of Law at 14. Alternatively, Harleysville seeks one half of that $900,000 under the theory of equitable contribution. *Id.* at 15. The court addresses these equitable theories in turn.

### 1. Harleysville is Not Entitled to Equitable Subrogation.

Equitable subrogation is a device "for placing the *entire* burden for a loss on the party ultimately liable or responsible for it and by whom it should have been discharged." *Home Ins. Co. v. Cincinnati Ins. Co.*, 213 Ill.2d 307, 316, 821 N.E.2d 269, 276 (2004) (emphasis in original). Equitable subrogation has three elements: "(1) the defendant carrier [here, Cincinnati] must be primarily liable to the insured [here, Boller] for a loss under a policy of insurance; (2) the plaintiff carrier [here, Harleysville] must be secondarily liable to the insured for the same loss under its policy;

---

[17] Defendants also contend that Cincinnati is primarily liable because Cincinnati breached its duty to defend under the Primary and Umbrella Policies. *See* Defs.' Reply at 17. As previously discussed, however, the court concludes that Cincinnati's duty to defend was not triggered under either policy.

and (3) the plaintiff carrier must have discharged its liability to the insured and at the same time extinguished the liability of the defendant carrier." *Id*. at 323, 821 N.E.2d at 280.

Defendants maintain that Cincinnati is "primarily liable" for the Kulasik settlement because Boller selectively tendered its complete defense and indemnification to Cincinnati. *See* Defs.' Reply at 17. Under Illinois' selective tender doctrine, an insured covered by multiple insurance policies has the right to "select" coverage under one policy and forgo coverage under others. *See Chicago Hosp. Risk Pooling Program v. Ill. State Med. Inter-Ins. Exch.*, 325 Ill. App. 3d 970, 976, 758 N.E.2d 353, 357 (1st Dist. 2001). If an insured selects coverage under two concurrent policies and does not subsequently "deactivate" coverage under one policy, then the selected insurers are co-insurers for the tendered claim. *See Dearborn Ins. Co. v. Int'l Surplus Lines Ins. Co.*, 308 Ill. App. 3d 368, 719 N.E.2d 1092 (1st Dist. 1999). In this case, Boller tendered its defense and indemnification to both Cincinnati and Harleysville, *see, e.g.*, Boller/Harleysville LR 56.1(a) Stmt. ¶¶ 127, 214, and Harleysville defended and indemnified Boller with respect to the Kulasik Suit. *See* Cincinnati LR 56.1(b) Stmt. ¶ 10. Boller could have "deactivated" Harleysville, but there is no evidence in the record that it actually did. *Id*. at ¶¶ 9–10. The selective tender doctrine does not permit an insured to seek and accept coverage from one insurer, then retroactively forgo that coverage in favor of coverage provided by a second insurer.[18] *See, e.g., Dearborn*, 308 Ill. App. 3d at 375; 719 N.E.2d at 1097.

---

[18]     As previously discussed, Boller was not covered by the Primary Policy with respect to Mr. Kulasik's injury, and, therefore, cannot "select" coverage under that policy. *Id*. at 980–81, 758 N.E.2d at 361 ("Without a duty to defend . . . [the alleged insured] . . . would not have two available policies from which to target and the selective tender rule would therefore not be applicable to him.").

Nor have Defendants persuaded the court that by tendering the claim to Cincinnati, Boller bypassed the coverage provided by both Harleysville policies. Coverage Opp'n at 12. To support this contention, Defendants rely on cases involving an insured's selection of coverage under one primary policy over concurrent coverage provided by a second primary policy. *See, e.g., John Burns Const. Co. v. Indiana Ins. Co.*, 189 Ill.2d 570, 574, 727 N.E.2d 211, 215 (2000) (insured selectively tendered defense and indemnification to primary insurer). Cincinnati argues that the court should be guided by *Liberty Mut. Ins. Co. v. Tokio Marine & Fire Ins. Co. Ltd.*, No. 03 C 4765, 2004 WL 2125411 (N.D. Ill. Sept. 22, 2004), an unreported decision in which the court held that an insured is not entitled to coverage under an excess policy until it has exhausted its primary layer of coverage. In *Liberty Mutual*, two general contractors were named as additional insureds on primary and excess policies issued to their subcontractor by Liberty Mutual. *Id.* at *5. When the general contractors were sued by an individual who allegedly sustained injuries at their construction site, they tendered their defense and indemnification to Liberty Mutual, who settled the case on their behalf. *Id.* Liberty Mutual then sought a declaration that Tokio Marine and Fire Insurance Co., which insured the general contractors under a separate primary policy, was liable for the portion of the settlement amount in excess of Liberty Mutual's primary policy limit. *Id.* at *5–6. Liberty Mutual's excess policy provided coverage for liability above a "retained limit," which it defined as the total amount of coverage provided by any other "valid and collectible" insurance. *Id.* at *7. Construing this language, the court concluded that Liberty Mutual's liability under the excess policy was not triggered until the insureds had exhausted primary coverage under both the Liberty Mutual and Tokio primary policies. *Id.* ("[S]elective tender applies only to concurrent coverage for the same

risk, and excess and primary policies did not cover the same risk.") (citing *Pacific Ins. Co. v. Cincinnati Ins. Co.*, No. 00 CH 9376 (Mar. 29, 2002)).

Applying the principle of "horizontal exhaustion" that guided the result in *Tokio,* the court concludes that Boller was required to exhaust coverage under the Harleysville Primary Policy before Cincinnati's Umbrella Policy was triggered. *Id.*; *see also AAA Disposal Syst., Inc. v. Aetna Cas. & Sur. Co.*, 355 Ill. App.3d 275, 286, 821 N.E.2d 1278, 1289 (2nd Dist. 2005) (non-selective tender case requiring "horizontal exhaustion" of primary layer of coverage "before recovery could be had from excess insurer"); *Amer. Nat. Fire Ins. Co. v. Nat. Union Fire Ins.*, 343 Ill. App. 3d 93, 108–09, 796 N.E.2d 1133, 1146 (1st Dist. 2003) (proposing to harmonize "horizontal exhaustion" and "target tender" doctrines by limiting the latter to "instances involving parties which are additional insureds under concurrent primary policies") (concurring opinion). A contrary rule would permit an insured to convert an umbrella policy into a primary policy without regard for the "unique and special" status of coverage afforded by an umbrella policy. *Illinois Emcasco*, 139 Ill. App. 3d at 133, 487 N.E.2d at 112. It would, in essence, give the insured more than it bargained for. *See id.* (umbrella policies typically charge low premiums relative to the coverage provided due to the decreased risk that the insurer will have to pay out on the policy); Umbrella Policy at 71 (MBC and its additional insureds received $1 million of excess coverage per occurrence for a $500 annual premium). Accordingly, Boller's selective tender was not effective to require Cincinnati to pay first-dollar liability for the Kulasik settlement from the Umbrella Policy.

The remaining issue is the scope of the two umbrella policies. Defendants argue that these policies provide concurrent, excess coverage, and argue that the court should extend the "selective tender" principle to embrace an insured's choice between two umbrella policies. Coverage Opp'n

at 14. But giving effect to Boller's selective tender to excuse Harleysville's obligation on its own umbrella policy would defeat terms in the Cincinnati Umbrella Policy that expressly limit indemnification to the "ultimate net loss" in excess of "all other insurance policies applicable to the occurrence." Umbrella Policy at 84 (internal quotation marks omitted). This "ultimate net loss" provision distinguishes cases cited by Defendants that hold that an "other insurance" clause in a primary policy does not permit a primary carrier to "reach into coverages provided under other policies merely because such other policies are in existence." *See John Burns*, 189 Ill. 2d at 577, 727 N.E.2d at 216 (quoting *Alcan United, Inc. v. West Bend Mut. Ins. Co.*, 303 Ill. App. 3d 72, 81, 707 N.E.2d 687, 693 (1st Dist. 1999)). These cases hold that coverage under "unselected" policies is not triggered, and therefore not available "other insurance." *Id.* at 578, 727 N.E.2d at 217. In contrast to the primary policies considered in these cases, Umbrella Policy coverage is triggered only by damages in excess of underlying insurance. *See* Umbrella Policy at 73.

To permit an insured to dictate what constitutes "underlying insurance" by tendering the claim to one carrier and not another alters the parties' bargain. *See American National*, 343 Ill. App. 3d at 109, 796 N.E.2d at 1146 (concurring opinion) (proposing to limit selective tender doctrine "to instances involving parties which are additional insureds under concurrent *primary* policies") (emphasis added). In any event, as previously discussed, Boller tendered to both Cincinnati and Harleysville; consequently, both umbrella policies constitute "available" insurance as that term is defined in the respective policies. There is, therefore, no basis for elevating one umbrella insurance policy above the other for equitable subrogation purposes.

## 2.     Harleysville is Entitled to Equitable Contribution.

Defendants argue in the alternative that Cincinnati is liable under the doctrine of equitable contribution for one half of the amount by which the Kulasik settlement exceeds the limits of Harleysville's Primary Policy.   Equitable contribution "permits one who has paid the entire loss to be reimbursed from other insurers who are also liable for the loss." *Schal Bovis Inc. v. Casualty Ins. Co.*, 315 Ill. App. 3d 353, 362, 732 N.E.2d 1179, 1186 (1st Dist. 2000).   Unlike subrogation, an action for equitable contribution is "based in equity and does not depend upon the contractual rights of the insured." *Progressive Ins. Co. v. Univ. Cas. Co.*, 347 Ill. App. 3d  10, 19, 807 N.E.2d 577, 585 (1st Dist. 2004).   An insurer seeking equitable contribution must prove: "(1) all facts necessary to the claimant's recovery against the insured; (2) the reasonableness of the amount paid to the insured; and (3) an identity between the policies as to parties and insurable interests and risks." *Schal Bovis*, 315 Ill. App. 3d at 362, 732 N.E. 2d at 1186.  The first factor is satisfied by the judgment against Boller in the Kulasik Suit, and Cincinnati does not contest the reasonableness of the Kulasik settlement.  Cincinnati does dispute the third element, claiming that its coverage is excess above the Harleysville Umbrella Policy and therefore does not cover the same risk.  *See* Cincinnati Opp'n at 21; *Schal Bovis*, 314 Ill. App. 3d at 363, 732 N.E. 2d at 1187 (excess and primary insurers insure different risks).

To support its argument, Cincinnati relies on the "Other Insurance" provision of its Umbrella Policy.  *See* Umbrella Policy at 81 ("The insurance provided by this policy is excess over any other valid and collectible insurance, other than insurance written specifically to be excess over this insurance, and shall not be contributory.").  Cincinnati argues that this language makes its policy

excess to the Harleysville Umbrella Policy, citing *American Country Ins. Co. v. The Hanover Ins. Co.*, 293 Ill. App. 3d 1025, 689 N.E.2d 186 (1st Dist. 1997). In *American Country*, the court had to decide which of two competing policies was excess with respect to the settlement of a wrongful death action filed against a common insured. *Id.* at 1027, 689 N.E.2d at 187–88. The plaintiff's umbrella policy provided that it was excess over any other insurance "except other insurance written to be excess over this insurance." *Id.* at 1026–27, 689 N.E. 2d at 187. The language of a competing, primary policy provided that it was "excess over any other insurance, whether primary, excess, contingent or on any other basis." *Id.* at 1027, 689 N.E. 2d at 187. The *American Country* court held that the general "other insurance" language in this primary policy was not "written specifically to be excess" over the umbrella policy. *Id.* at 1032, 689 N.E.2d at 391. Absent such language, the court applied the general rule that an umbrella policy is excess to a primary policy with an "other insurance" clause. *Id.*

*American Country* does not support Cincinnati's argument that its Umbrella Policy is excess to Harleysville's Umbrella Policy. As discussed, that case involved an umbrella policy and a primary policy with an "other insurance" clause; it does not constitute authority for elevating one umbrella policy over another, particularly where, as here, both policies contain "written to be excess" provisions. *Compare* Umbrella Policy at 81, *with* Harleysville Umbrella Policy at 206; *see also Putnam v. New Amsterdam Cas. Co.*, 48 Ill.2d 71, 78–79, 269 N.E.2d 97, 100–101 (1970) (court should prorate liability between insurers where "other insurance" clauses are incompatible). The two umbrella policies in this case insure Boller for the same risk at the same level. Accordingly,

Harleysville is entitled to equitable contribution for the amount by which the Kulasik settlement exceeded Harleysville's Primary Policy, $900,000.

Under Illinois law, "[a] loss covered solely by two excess carriers forces 'the insurers to divide the liability equally between themselves.'" *See N. Amer. Specialty Ins. Co. v. Liberty Mut. Ins. Co.*, 297 Ill. App. 3d 595, 598, 696 N.E. 2d 347, 349 (1st Dist. 1998) (quoting *Cont. Nat. Amer. Ins. Co. v. Aetna Life & Cas. Co.*, 186 Ill. App. 3d 891, 898, 542 N.E.2d 954, 958 (1st Dist. 1989)). Cincinnati argues that the default rule does not apply because Harleysville's Umbrella Policy provides for liability sharing by "relative limits" where other applicable insurance does not provide for contribution by "equal shares."[19] *See Univ. Underwriters Ins. Group v. Griffin*, 287 Ill. App. 3d 61, 75–76, 677 N.E.2d 1321, 1331 (1st Dist. 1997) (abrogated on other grounds) (apportioning liability by limits where one policy provided for this method and the parties agreed that it was appropriate).

---

[19]     Harleysville's Umbrella Policy provides:
When both this insurance and other insurance apply to the loss on the same basis, whether primary, excess or contingent, we shall not be liable under this policy for a greater proportion of the loss than that stated in the applicable contribution provision below:
>     (a)     Contribution by Equal Shares.
>     If all such other valid and collectible insurance provides for contribution by equal shares, we shall not be liable for a greater proportion of such loss than would be payable if each insurer contributes an equal share until the share of each insurer equals the lowest applicable limit of liability under any one policy or the full amount of the loss is paid, and with respect to any amount of loss not so paid the remaining insurers then continue to contribute equal shares of the remaining amount of the loss until each insurer has paid its limit in full or the full amount of the loss is paid.
>     (b)     Contribution by Limits.
>     If any such other insurance does not provide for contribution by equal shares, we shall not be liable for a greater proportion of such loss than the applicable limit of liability under this policy for such loss bears to the total applicable limit of all valid and collectible insurance against such loss.

*See* Harleysville Umbrella Policy at 200.

Because its policy is silent on apportionment, Cincinnati argues that the "relative limits" method applies. *See* Cincinnati Opp'n at 23; Harleysville Umbrella Policy at 200 ("If any such other insurance does not provide for contribution by equal shares . . . .").

The court disagrees. Harleysville's Umbrella Policy states only that where, as here, it applies to a loss on the same basis as other insurance, Harleysville "*shall not be liable for a greater proportion of such loss than the applicable limit of liability under this policy for such loss bears to the total applicable limit of all valid and collectible insurance against such loss.*" *See* Harleysville Umbrella Policy at 200 (emphasis added). *Cf.*, *Univ. Underwriters*, 287 Ill. App. 3d at 75–76, 677 N.E.2d at 1331 (policy provided that "*we will bear* our proportionate share with other collectible liability insurance.") (emphasis added). This provision attempts to cap Harleysville's ultimate liability; it does not require the court to prorate liability according to "relative limits." Moreover, unlike the parties in *Universal Underwriters*, Harleysville does not agree that this is the proper apportionment method. *Id.* Accordingly, the default rule applies and the court apportions excess liability equally between Harleysville ($450,000) and Cincinnati ($450,000).

## CONCLUSION

Defendants' motion for summary judgment (44) is denied in part and granted in part; Cincinnati's motion for summary judgment on coverage (49) is denied in part and granted in part; Cincinnati's motion for summary judgment on reformation is granted (50). The court awards summary judgment in Cincinnati's favor and against Defendants on Counts I–III of Harleysville's Intervening Complaint, and on Count I of Cincinnati's Counterclaim against Harleysville, as the court concludes that Cincinnati did not breach its duty to defend Boller. The court grants summary

judgment in Cincinnati's favor and against Defendants on Count IV of Harleysville's Intervening Complaint requesting reformation of the Primary Policy. The court grants summary judgment Cincinnati's favor and against Defendants' on Count V of Harleysville's Intervening Complaint, requesting equitable subrogation. Finally, the court grants summary judgment in Defendants' favor and against Cincinnati on Counts II and III of Cincinnati's Counterclaim (denying any obligation to participate in the Kulasik settlement or, in the alternative, requesting sharing by relative limits), and on Count VI of Harleysville's Intervening Complaint, requesting equitable contribution.

ENTER:

Dated: March 15, 2006

REBECCA R. PALLMEYER
United States District Judge